James E. NORTHERN and Shirley Northern, Plaintiffs-Appellees,

v.

McGRAW–EDISON COMPANY, Defendant-Appellant,

Betty Soper and Jeffson Industries, Inc., Intervenors-Appellees.

No. 75–1738.

United States Court of Appeals, Eighth Circuit.

Submitted April 16, 1976.

Decided Sept. 29, 1976.

Rehearing and Rehearing En Banc Denied Nov. 15, 1976.

Malcolm D. Young, Omaha, Neb., Leland C. White, Harland, Iowa, and Jerome Waterman, Kansas City, Mo., for McGraw-Edison Co.

Joseph A. Sherman and Paul L. Wickens, and Sheridan Morgan, Kansas City, Mo., for James E. Northern, Shirley Northern, Betty Soper, Jeffson Industries, Inc.

Before GIBSON, Chief Judge, ROSS and HENLEY, Circuit Judges.

GIBSON, Chief Judge.

Defendant, McGraw-Edison Company (McGraw), appeals from a judgment entered by the District Court[1] upon a jury verdict in favor of plaintiffs James and Shirley Northern (Northern), Betty Soper and Jeffson Industries, Inc. (Jeffson),[2] on various antitrust and fraud claims. This litigation arose out of the sale to plaintiffs of four Arnold Palmer Cleaning Centers

---

1. The Honorable Elmo B. Hunter, United States District Judge for the Western District of Missouri.

2. The initial complaint in this action was filed against defendant by plaintiff Northern on De- cember 29, 1971. Betty Soper's motion to intervene pursuant to Fed.R.Civ.P. 24(b) was granted on July 31, 1972. Jeffson was permitted to intervene as plaintiff on September 6, 1972.

**1340**

(A.P. Centers), which were distributed by defendant through its dealer, John Jacobson.[3] Northern and Soper each purchased one of the A.P. Centers and Jeffson purchased two.

Plaintiffs' individual complaints sought a judgment against defendant on three counts. Count I alleged that defendant violated § 3 of the Clayton Act, 15 U.S.C. § 14 (1970), and § 1 of the Sherman Act, 15 U.S.C. § 1 (Supp. V, 1975), by distributing A.P. Centers pursuant to an illegal tying arrangement in which the purchaser was obligated to purchase equipment and incidental materials from defendant in order to secure the A.P. Center franchise and "Arnold Palmer" trademark.[4] Count II alleged that defendant and Jacobson made certain misrepresentations to induce plaintiffs to purchase the A.P. Centers and that plaintiffs were entitled to actual damages for economic injury sustained due to these false statements. Count III alleged that the misrepresentations in Count II were made willfully and maliciously and that plaintiffs were entitled to punitive damages.

In order to better comprehend the nature of the case, it is beneficial to initially review the relationship between Jacobson and defendant, to consider the activities of Jacobson preceding the sales of the A.P. Centers to the plaintiffs and to discuss the method of distributing A.P. Centers utilized by defendant. Thereafter, each plaintiff's case will be segregated and the facts relating to each purchase summarized.

In 1965 Jacobson, who maintained interests in various dry cleaning operations, attended a National Institute of Dry Cleaners convention. At that convention he met with two representatives of the Arnold Palmer Cleaning Center Sales Division (A.P.C.C.S.), which was the division responsible for distributing A.P. Centers on defendant's behalf. After extolling the economic virtues of a dry cleaning franchise identified with the name of Arnold Palmer, the representatives induced Jacobson to become an authorized dealer of A.P. Centers. Following his execution of the dealership agreement, Jacobson attended numerous indoctrination meetings with A.P.C.C.S. personnel, where he was advised of how to sell, promote and advertise A.P. Centers. He was also instructed on how to fill out the various forms which had been printed by A.P.C.C.S. and which were required to be used in consummating the sales of A.P. Centers. In addition to providing Jacobson with printed sales forms, A.P.C.C.S. forwarded catalogs, machinery price lists, site evaluation forms, financial projection forms for prospective franchisees, advertising manuals, dealer memoranda and periodic newsletters to Jacobson.

Armed with his training and promotional materials, Jacobson proceeded to sell A.P. Center franchises to interested investors. Favorable locations for A.P. Centers were hard to find and, since a dealer had not always secured a willing buyer of a franchise when a good location became available, A.P.C.C.S. encouraged Jacobson and other dealers to utilize a purchase-resale procedure as a method of distributing A.P. Centers. Pursuant to this procedure, a dealer would select a favorable location for an A.P. Center and secure confirmation of his selection from A.P.C.C.S. Upon confirmation, the dealer would personally execute a lease for the location. The dealer would then enter into a franchise agreement with A.P.C.C.S., which authorized the dealer to use the name "Arnold Palmer" in association with the dry cleaning business for a period of five years. Finally, the dealer would execute a Sign and Back Drop Lease

**3.** There were actually five separate A.P. Center purchases initially involved in this case. However, as to the purchase by Jeffson of the A.P. Center at Noland Plaza Shopping Center in Independence, Missouri, the jury awarded no monetary relief. Therefore, the facts surrounding the purchase of the Noland Plaza store will not be discussed in this opinion.

**4.** Plaintiffs also alleged that defendant practiced price discrimination in the distribution of the A.P. Center franchises in violation of the Robinson-Patman Act. 15 U.S.C. §§ 13, 13a (1970). However, this claim was not submitted to the jury and we have no occasion to discuss it on this appeal.

Agreement with A.P.C.C.S. which permitted the dealer to place a large "Arnold Palmer Cleaning Center" sign on the exterior of the building and to use a specially designed back drop in the interior. The dealer would also arrange to make the A.P. Center operational by purchasing all equipment from A.P.C.C.S. at dealer's cost. In most instances, the dealer would finance the equipment purchase through Edison Acceptance Corporation (E.A.C.), which, like A.P.C.C.S., was a subsidiary of defendant McGraw.

The dealer would thereafter attempt to sell the A.P. Center as a "package deal" to prospective franchisees. If such a sale were arranged, the dealer and the franchisee generally executed three documents: (1) an assignment of the lease on the location from the dealer to the franchisee; (2) an assignment of the Sign and Back Drop Lease Agreement with A.P.C.C.S. from the dealer to the franchisee; and (3) an Assumption Agreement by which, upon E.A.C. approval, the franchisee would secure rights to the A.P. Center equipment by taking over the dealer's payments to E.A.C. A dealer would negotiate for the highest price obtainable when marketing A.P. Centers in this fashion. The dealer would be entitled to any profit secured from the sale.

In three of the four A.P. Centers involved in this litigation, Jacobson utilized this purchase-resale procedure. Of these three, one was sold to plaintiff Soper's husband and two were sold to plaintiff Jeffson. The fourth A.P. Center, purchased directly by Northern, had not previously been rendered operational by Jacobson, nor had Jacobson become a franchisee for that Center. Each of these sales will be discussed below in relation to the individual plaintiff's case.

A. *Northern v. McGraw-Edison Company.* The litigation as to Northern arose out of the purchase of an A.P. Center in Raytown, Missouri. Northern was an architect who became interested in a dry cleaning operation for investment purposes. Northern contacted Jacobson, who showed Northern a potential Raytown location. Jacobson also completed for Northern's benefit a Financial Projection Form, which had been printed by A.P.C.C.S. and which reflected that Northern could anticipate a monthly income in excess of $1,000 from the A.P. Center. Northern eventually agreed to become a franchisee and he and Jacobson executed a lease for the Raytown location. Northern signed the A.P.C.C.S. franchise agreement, as well as the Sign and Back Drop Lease agreement, on June 28, 1967. Northern was informed by Jacobson on numerous occasions that in order to obtain the franchise, the franchisee must purchase the whole equipment package. Furthermore, the franchise and equipment were billed as a package item. No detailed or listed price was invoiced for the separate items making up the package. Accordingly, the package of equipment was sent by A.P.C.C.S. to Jacobson, who in turn sold the equipment to Northern for approximately $30,000.

At trial in the District Court, Northern's Count I claim that defendant's mode of distribution constituted an illegal tying arrangement was dismissed.[5] On the Count II misrepresentation claim, Northern was awarded $15,000 by the jury. Northern also received a $100,000 award of punitive damages pursuant to Count III.

B. *Soper v. McGraw-Edison Company.* Soper's claim emanates from the purchase by her husband of an A.P. Center in Liberty, Missouri. This Liberty A.P. Center was purchased from Jacobson pursuant to the purchase-resale distribution procedure outlined above. Jacobson had become the franchisee of the Liberty store in December, 1965. He purchased the equipment for the store from A.P.C.C.S. at dealer's cost and financed the purchase through E.A.C. Jacobson then sold the Liberty A.P. Center

---

5. While the record is not clear on this subject, it appears that Northern's antitrust claim was dismissed as being untimely filed. Northern's purchase of the Raytown A.P. Center was essentially consummated on June 28, 1967. Therefore, the filing of the complaint on December 29, 1971, was not timely in light of the four year statute of limitation contained in 15 U.S.C. § 15b (1970).

to Soper's husband on October 10, 1968. The parties then executed an assignment of the franchise agreement and the Sign and Back Drop Lease agreement. Also, Soper's husband assumed Jacobson's E.A.C. obligation. Soper's husband died in 1970 and Soper operated the store until it was eventually sold on December 31, 1972. At trial Soper obtained a jury award of $10,000 on her Count I antitrust claim (trebled to $30,-000 by the court), $8,000 for fraud, $100,000 in punitive damages on Count III and attorneys' fees of $36,200.

C. *Jeffson v. McGraw-Edison Company.* In 1963 Jacobson and Roy Jeffress organized and incorporated Jeffson Industries, Inc., for the purpose of establishing a chain of coin-operated car washes. In late 1966 the principals of Jeffson decided that Jeffson should diversify and expand into the dry cleaning business. Pursuant to this decision, Jeffson purchased two [6] A.P. Centers from Jacobson. These stores were located at 95th and Blue Ridge in Kansas City, Missouri (Blue Ridge store), and the Gladstone Plaza Shopping Center in Gladstone, Missouri (Gladstone store). Both stores were purchased by Jeffson from Jacobson pursuant to the purchase-resale distribution method.

Jacobson purchased the equipment for the Blue Ridge store in 1965 and executed the requisite franchise agreement at that time. The store was set up as a pilot store where potential franchisees could view the typical operation of an A.P. Center. In 1969 Jeffson purchased the Blue Ridge store from Jacobson. Jeffson assumed the balance of Jacobson's E.A.C. obligation and tendered $20,000 in cash and a $16,424 promissory note to Jacobson. All of the necessary assignments were completed.

As to the Gladstone store, it had been equipped by Jacobson in 1966. Jeffson agreed to purchase the Gladstone A.P. Center by assuming Jacobson's E.A.C. obligations, paying Jacobson $24,000 in cash and giving a promissory note for $13,100.

Again, all of the necessary assignment documents were duly executed.

Jeffson was awarded $52,000, trebled to $156,000 by the court, for the antitrust violations attendant to the purchase of the Blue Ridge and Gladstone stores, and attorneys' fees of $54,300. The jury denied relief on the Count II misrepresentation claim and the Count III punitive damage claim.

I. *Agency Issue.*

The initial issue raised on this appeal involves the question of whether Jacobson was an agent for defendant when he was engaging in the negotiation and sale of the A.P. Centers in this case. Plaintiffs' case is wholly dependent upon Jacobson occupying an agency status since Jacobson was the ostensible seller and was intimately involved in all the transactions giving rise to the damage awards. Jacobson's agency status is indispensable to plaintiffs' fraud claims since it is contended that Jacobson made several misrepresentations while acting as defendant's agent and that the misstatements are therefore imputable to defendant. Furthermore, as to the antitrust charges, plaintiffs contend that Jacobson was acting within the scope of his agency while participating in the purchase-resale distribution procedure and that the sales to plaintiffs should be treated as direct sales from defendant.

Defendant, on the other hand, disclaims any control or influence over Jacobson's distribution activities and alleges that Jacobson was acting as an independent contractor in the A.P. Center sales. Defendant asserts that it discontinued all significant involvement in the distribution of A.P. Centers after dealers such as Jacobson became franchisees of their own A.P. Centers and that second-level sales between Jacobson and plaintiffs in this case were beyond its control. Defendant contends that the evidence is insufficient to show that Jacobson was an agent and vigorously contends that the District Court should not have submitted that issue to the jury.

---

**6.** Although Jeffson purchased a total of three A.P. Centers, only two are relevant to the matters presented on this appeal. See note 3 *supra.*

The traditional formulation of what constitutes an agency relationship is as follows:

Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.

*Restatement (Second) of Agency* § 1 (1958); *accord, Leidy v. Taliaferro,* 260 S.W.2d 504, 505 (Mo. 1953).

In assessing whether an individual occupies the status of an agent, it is necessary to review the facts and circumstances surrounding that individual's activities to determine whether the purported principal exerts the requisite control over the individual so as to create an agency relationship.[7] *Aetna Insurance Co. v. Glens Falls Insurance Co.,* 453 F.2d 687, 690 (5th Cir. 1972). Since this determination requires the finding and weighing of numerous facts, the ultimate resolution is appropriately left to the province of the jury in most instances. *Wood v. Holiday Inns, Inc.,* 508 F.2d 167, 173 (5th Cir. 1975); *Baker v. St. Paul Fire & Marine Insurance Co.,* 427 S.W.2d 281, 293 (Mo.App.1968). It is only where the facts are not in dispute and there is no real issue for the jury to resolve that the trial court should rule on the agency issue as a matter of law. *Burriss v. Texaco, Inc.,* 361 F.2d 169, 174 (4th Cir. 1966); *Baker v. St. Paul Fire & Marine Insurance Co., supra* at 293.

We have reviewed the extensive record in this case and conclude that, although the question is a close one, the District Court did not err in submitting the agency issue to the jury. There was suffi-cient evidence adduced at trial to support plaintiffs' contention that defendant exerted influence and control over significant aspects of Jacobson's distribution activities.

Prior to becoming a dealer for defendant, Jacobson had substantial experience in the dry cleaning industry. He had operated seven dry cleaning plants and some formal wear rental establishments in the greater Kansas City area. Jacobson was appointed as a dealer for defendant originally for the western counties of Missouri, but his area was later extended to cover Kansas, Oklahoma and Colorado. In performing his dealership responsibilities, Jacobson paid his own office expenses and overhead except for the supplies and forms furnished to him by defendant. At defendant's urging, Jacobson listed himself as an "Arnold Palmer Dealer" in the Yellow Pages of the telephone directory; defendant, through A.P.C. C.S., paid one-half of the cost of that listing.

After Jacobson executed defendant's dealership contract, defendant undertook an extensive and continuous campaign through A.P.C.C.S. to direct Jacobson in the distribution of the A.P. Centers. Jacobson attended numerous sales meetings at which he was instructed as to how to complete the many A.P.C.C.S.-prepared forms.[8] Jacobson was also encouraged to distribute pursuant to the purchase-resale system and to hire salesmen to promote the sales effort. In line with this method of operation, Jacobson attempted to secure favorable locations for A.P. Centers by placing ads in the local paper. When Jacobson selected a site for a proposed A.P. Center, his selection was forwarded to A.P.C.C.S. for confirma-

7. The dealership contract in this case characterized Jacobson as an independent contractor. This characterization is not controlling on the agency question. If the surrounding facts evidence an agency relationship, however "artfully disguised", the parties cannot negative its existence by representing that it is something other than an agency relationship. *Board of Trade v. Hammond Elevator Co.,* 198 U.S. 424, 437–38, 441, 25 S.Ct. 740, 49 L.Ed. 1111 (1905).

8. In addition to training dealers in the proper way to fill out the printed forms, A.P.C.C.S. was vigilant in assuring that the forms were completed in accordance with A.P.C.C.S. standards. In 1970 A.P.C.C.S. notified dealers that the submission of contracts and supplemental documents which had been dated by dealers prior to filing "seriously endanger[ed] [A.P.C.C. S.'s] legal position." Dealers were informed that all contracts received by A.P.C.C.S. must be undated or they would be returned to the dealers.

tion and at least one A.P.C.C.S. official testified that A.P.C.C.S. was empowered to instruct Jacobson that the site was unacceptable and should not be used for an A.P. Center. A.P.C.C.S. disseminated price lists which set forth the prices at which various A.P. Centers should be sold. A.P.C.C.S. also established sales quotas for its dealers which were characterized as advisory, not mandatory. However, some dealers were terminated for failing to achieve a sufficient volume of orders. A.P.C.C.S. paid a portion of Jacobson's advertising expenses and supplied him with brochures and other material to facilitate distribution of A.P. Centers. In 1967 A.P.C.C.S. personnel attended a franchise show in Kansas City, talked with prospective franchisees and encouraged them to purchase A.P. Centers from Jacobson. A.P.C.C.S. also provided its dealers with sales leads and prodded the dealers to submit reports as to the outcome of the contacts with these prospects.

We believe the evidence, viewed in its entirety, supplied an adequate showing of control by defendant over Jacobson's activities to justify submission of the agency issue to the jury. While there is conflicting evidence from which contrary inferences can be drawn, there is also substantial and competent evidence that supports the District Court's decision to permit the jury to resolve this issue. The evidence is not so demonstrably clear, as contended by defendant, as to command only one result. To the contrary, there is evidence from which the jury could have inferred that defendant directed and controlled Jacobson in the distribution of the A.P. Centers. We therefore accept the jury's finding that Jacobson was acting as defendant's agent when distributing the A.P. Centers to the plaintiffs and think that this finding has sufficient evidentiary support in the record.

## II. *Antitrust Claims.*

■ Defendant assails the jury's finding that the method of distributing A.P. Centers constituted an illegal tying arrangement in contravention of § 1 of the Sherman Act. 15 U.S.C. § 1.[9] A tying arrangement exists when a person agrees to sell one product (the tying product) only on the condition that the vendee also purchase another product (the tied product). *Northern Pacific Ry. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The pernicious effect on competition from such an arrangement is clear. The distributor using such a method is utilizing its power and position in the tying product market to gain competitive leverage in the tied product market. Vendees desirous of purchasing the tying product are of necessity forced to abdicate their free will and purchase the tied products from the distributor of the tying product regardless of whether there are items of greater quality and less expense in the tied product market. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 605, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). Competitors in the tied product market are similarly disadvantaged since they are unable to offer their products to the consuming public on an equal basis with the distributor of the tying product. *United States v. Loew's Inc.,* 371 U.S. 34, 44–45, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). In short, "[t]ying arrangements * * * flout the Sherman Act's policy that competition rule the marts of trade." *Times-Picayune Publishing Co. v. United States, supra* at 605, 73 S.Ct. at 878.

■ Since tying arrangements inevitably hurt competition in the tied product market, they "fare harshly under the laws forbidding restraints of trade." *Times-Picayune Publishing Co. v. United States, supra* at 606, 73 S.Ct. at 879. Such arrange-

---

**9.** In their complaints plaintiffs also contended that the tying arrangement violated § 3 of the Clayton Act. 15 U.S.C. § 14. In order to prevail under § 3, plaintiffs must establish that the tying item, the A.P. Center franchise, constitutes "goods, wares, merchandise, machinery, supplies, or other commodities." We need not, for purposes of this case, determine wheth-

er a tying arrangement involving a franchise would be cognizable pursuant to § 3 of the Clayton Act. See *Ungar v. Dunkin' Donuts of America, Inc.,* 531 F.2d 1211, 1215 n. 4 (3d Cir. 1976). The antitrust claim was submitted to the jury solely on the basis of § 1 of the Sherman Act and plaintiffs do not urge the applicability of Clayton Act § 3 on this appeal.

ments constitute per se violations of § 1 of the Sherman Act when the evidence establishes the following essential elements: First, that an individual has actually tied two separate and distinct products into a single package, *Times-Picayune Publishing Co. v. United States, supra* at 614, 83 S.Ct. 97; second, that the individual possesses sufficient economic power in the tying product market to appreciably restrain competition; and, third, that the arrangement affects a "not insubstantial" amount of interstate commerce. *Northern Pacific Ry. v. United States, supra* at 6, 78 S.Ct. 514. If the plaintiff proves a per se violation, the tying arrangement is automatically illegal and there need not be any further judicial inquiry as to whether any unreasonable competitive effects result. *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 498, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

In attacking the proof relating to the first element of the per se formulation, defendant contends that its method of distribution did not involve the aggregation of two separate products. It is defendant's position that the enterprises purchased by plaintiffs constituted single, individual products in the form of "going businesses". However, such a characterization ignores the realities of the situation.

 A franchise license constitutes a separate and distinct marketable item. The weight of judicial authority supports the proposition that if prospective franchisees are compelled to purchase equipment or other tied products in order to obtain the franchise and trademark, an illegal tying arrangement exists. *Warriner Hermetics, Inc. v. Copeland Refrigeration Corp.,* 463 F.2d 1002, 1012–1016 (5th Cir.), *cert. denied,* 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972); *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43, 47–49 (9th Cir. 1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972); *see Susser v. Carvel Corp.,* 332 F.2d 505 (2d Cir. 1964), *cert. dismissed,* 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965). *See generally,* Annot., 14 A.L.R. Fed. 473 (1973). We subscribe to this view. Defend-

ant marketed a highly attractive franchise which offered the use of the Arnold Palmer name and trademark to prospective franchisees. However, the record is replete with evidence that prospective franchisees could obtain the franchise and trademark only if they also purchased the package of dry cleaning equipment and incidental materials from defendant. Therefore, defendant was marketing its A.P. Center franchises by using an illegal tying arrangement as typified in the above cases.

 Defendant seeks to avoid this result by inserting dealer/agents into its distribution scheme. Defendant argues that even if direct sales from it to franchisees may constitute an illegal tying arrangement, a different result is mandated when the A.P. Centers are sold by defendant to dealer/agents who in turn make the plants operational and resell them as "going businesses". However, circumvention of the antitrust laws is not so easily achieved. Substance, not form, controls our inquiry. *United States v. Sealy, Inc.,* 388 U.S. 350, 352, 87 S.Ct. 1847, 18 L.Ed.2d 1538 (1967). A distribution method which is illegal when conducted by a manufacturer is not rendered legal by the simple expedient of enlisting agents to perform the same activity on behalf of and under the control of the manufacturer. Just as a manufacturer cannot avoid the price-fixing proscription of the Sherman Act by setting up sham "agencies" to distribute its product at a set price, *Dr. Miles Medical Co. v. John D. Park & Sons,* 220 U.S. 373, 398–99, 407, 31 S.Ct. 376, 55 L.Ed. 502 (1911), defendant cannot avoid antitrust liability by having agents under its direction and dominion market A.P. Center franchises pursuant to the illegal tying arrangement described above.

We stress what this case does not involve. This is not a situation where there was an isolated sale of a going business whereby the buyer was obligated to purchase the entire operational package. Rather, this case presents a deliberate distribution scheme in which dealer/agents were initially sold a package comprised of a tying product and numerous tied products and

then were encouraged to distribute these "packages" to prospective franchisees. Jacobson informed prospective franchisees that they could secure the Arnold Palmer franchise only if dry cleaning equipment and other materials were purchased in conjunction with the franchise. This tying arrangement scheme using agents, as opposed to independent contractors, as conduits for the sale of A.P. Center "packages" in this fashion is contrary to the policy and principles of the Sherman Act. *Cf. Beefy Trail, Inc. v. Beefy King International, Inc.,* 348 F.Supp. 799, 806–07 (M.D.FLa.1972).

As to the second element of proof for the per se rule, the record reflects that defendant possessed sufficient economic power in the tying product market to restrain competition. The record does not clearly reflect the full extent of defendant's power and position in the dry cleaning franchise market, although defendant is referred to by plaintiffs as the world's largest manufacturer of laundry and dry cleaning equipment. Regardless, "[t]he standard of 'sufficient economic power' does not * * require that the defendant have a monopoly or even a dominant position throughout the market for the tying product." *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 502, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495, (1969). Sufficient economic power exists if the distributor of the tying product has sufficient leverage in the market to increase prices or to force a significant number of buyers to accept burdensome terms. *Fortner Enterprises, Inc. v. United States Steel Corp., supra* at 504, 89 S.Ct. 1252. The District Court in this case reviewed the record and concluded that defendant's franchise was unique in nature and possessed a high degree of desirability to prospective franchisees. We agree that these attributes of uniqueness and desirability, coupled with the power of defendant to impose the tying arrangement on buyers at

an artificially enhanced price, constitute sufficient economic power. *Fortner Enterprises, Inc. v. United States Steel Corp., supra; United States v. Loew's Inc.,* 371 U.S. 38, 45, 83 S.Ct. 97 (1962).[10]

Defendant also contends that the third element of the per se rule was not established since the sales of A.P. Centers in this case were wholly intrastate in nature; thus, no interstate commerce was affected. Regardless of how local the immediate effect of an activity might be, it satisfies the jurisdictional prerequisite of the Sherman Act if the activity has a substantial and adverse effect on interstate commerce. *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 195, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974). In determining the effect on interstate commerce, "the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimus,* is foreclosed to competitors by the tie * * *." *Fortner Enterprises, Inc. v. United States Steel Corp., supra* at 501, 89 S.Ct. 1252, 1258; *see International Salt Co. v. United States,* 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20 (1947). Defendant marketed its franchised stores in over 30 states and, over a six year period, sold nearly $9,000,000 in equipment and other materials in association with the distribution of A.P. Center franchises. Free competition in the tied product market would have permitted numerous manufacturers, otherwise foreclosed because of the tying arrangement, to compete for a portion of the substantial market deliberately manipulated and controlled by defendant. *See Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *Burke v. Ford,* 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967). Therefore, we agree with the District Court that a "not insubstantial" amount of interstate commerce was affected.

---

**10.** Based upon the holding that the nature of defendant's product and the extent of defendant's leverage in the market compel the conclusion that defendant possesses sufficient economic power, we need not decide whether such economic power can be automatically presumed in all cases when the tying product is a trademark. *Compare Siegel v. Chicken Delight, Inc., supra* at 50, *with Capital Temporaries, Inc. v. Olsten Corp.,* 506 F.2d 658, 663–64 (2d Cir. 1974).

Plaintiffs' evidence in this case inexorably indicates that defendant's tying arrangement constituted a per se violation of § 1 of the Sherman Act. However, courts have ruled that using tying arrangements as marketing devices is not unlawful if defendant advances compelling business justifications for their use. *Susser v. Carvel Corp., supra,* 332 F.2d at 519. One such justification exists if defendant proves that a substitute for the tied product must comply with such precise and detailed specifications that other manufacturers may not be able to market a product functionally compatible with the tying product. *Standard Oil Co. v. United States,* 337 U.S. 293, 306, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949); *International Salt Co. v. United States, supra* at 397–98, 68 S.Ct. 12. Another justification is that a small company may be compelled to use tying arrangements in order to permit it to scale the high barriers of entry into a new market. *United States v. Jerrold Electronics Corp.,* 187 F.Supp. 545, 557 (E.D.Pa. 1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961); *see Brown Shoe Co. v. United States,* 370 U.S. 294, 330, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Defendant does not argue that either of these justifications is applicable in this case and the evidence fails to support their application. Defendant's only asserted justification for the tying arrangement is that it is more convenient for franchisees to invest in a business enterprise in which all the necessary components are grouped together and marketed in one inseparable package. Even if franchisees' convenience would be best served by such an arrangement, a fact which has not been independently established in this record, this alone would not provide a basis for legalizing such an anticompetitive method of distribution. We therefore conclude that there is a legal and factual basis for supporting the antitrust awards in this case.

Defendant also contends that the amount of damages awarded for the antitrust claims lacks evidentiary support. The parties concede that the measure of damages in a tying arrangement case is the amount of the overcharge, or the difference between the price paid for the tied items and the fair market value of the tied items at the time of purchase. *Siegel v. Chicken Delight, Inc., supra,* 448 F.2d at 52; *see Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 488–89, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). Plaintiffs presented an expert witness who testified as to the fair market value of the tied A.P. Center equipment at the time it was initially purchased by the respective plaintiffs. The jury had before it the terms of the purchases by the plaintiffs. By comparing these figures, the jury could calculate the amount of the overcharge. The awards issued by the jury were comfortably within the range of reasonableness. We conclude that the jury awards did not rest on guess work or speculation but rather were adequately supported by evidence presented at trial. *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264–66, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

### III. Fraud Claims.

Defendant contends that plaintiffs Northern and Soper failed to present sufficient evidence to support the jury's awards on the fraud counts. The fraud counts were premised upon three alleged misrepresentations which had been made to plaintiffs by defendant or Jacobson. These allegedly false statements were: (1) a representation by Jacobson that an independent firm had conducted a national market survey to analyze the impact of the Arnold Palmer name on the dry cleaning industry; (2) defendant's statement that every A.P. Center franchise would be supported by a continuous program of local advertising at no cost to the franchisee; and (3) Jacobson's representation that the location of A.P. Centers had been analyzed by utilizing a special form prepared for the dry cleaning industry.

Missouri law, which concededly controls in this diversity cause of action, defines fraud in its traditional sense. The elements of fraud are a representation; its falsity; its materiality; the

speaker's knowledge of the falsity or his ignorance of the truth; the speaker's intent that his statement should be acted upon by the person and in the manner reasonably contemplated; the hearer's ignorance of the falsity of the statement; his reliance on its truth; his right to rely thereon; and his consequent and proximately caused injury.

*Ackmann v. Keeney-Toelle Real Estate Co.,* 401 S.W.2d 483, 488 (Mo.1966). Defendant's primary contention is that the representations made to plaintiffs were not false. Since plaintiffs prevailed on this theory at trial, we must consider the evidence and all permissible inferences which can be derived from that evidence in the light most favorable to plaintiffs and all conflicts in the evidence must be resolved in their favor. *Illinois Terminal R.R. v. Feltrop,* 130 F.2d 982, 984 (8th Cir. 1942).

■ Northern and Soper presented sufficient evidence to support their claim that Jacobson misrepresented the fact that an independent firm had analyzed the impact of the Palmer name on the dry cleaning industry. Both testified that Jacobson informed them that such a study had been made and that it was determined that the Palmer name would be "good" for the dry cleaning industry for approximately 10 years. The evidence establishes that one of defendant's divisions, American Laundry Machinery Industries, and not an independent firm, conducted an investigation which disclosed that an Arnold Palmer sponsorship would be of economic benefit. Richard Lester, one of defendant's employees who set up the A.P. Center franchising system, testified that the survey did not purport to determine the value of the Arnold Palmer name in the dry cleaning industry. Furthermore, there was no evidence to support

the statement that the Palmer name would retain economic viability for 10 years. The representations made by Jacobson in this regard were clearly false.

■ The second alleged misrepresentation relates to whether plaintiffs were informed that they would be supplied by defendant with local advertising at no cost to them. A promotional brochure distributed by defendants and reviewed by plaintiffs contained the following: "Your Arnold Palmer Cleaning Center Franchise is backed with a strong, continuous program of local and national advertising in newspapers and magazines, on radio and television." This language gives rise to an implication that franchisees would incur no cost in local advertising campaigns promoting their A.P. Centers. Northern testified he was led to believe that there would be no charge for local advertising, relying upon the language of the brochure. Soper testified that she was informed by Jacobson that part of her franchise fee would be used by defendant to supply local advertising. However, Lester testified that defendant never intended to provide cost-free local advertising to franchisees. While plaintiffs actually received some advertising and promotional material from defendant, the cost of placing local advertisements was not assumed by defendant. We believe that there is sufficient evidence in the record from which the jury could find that plaintiffs were falsely advised that they would not have to pay for local advertising.[11]

■ There is also sufficient evidence to establish the falsity of Jacobson's representations in regard to the analysis of the locations of A.P. Centers undertaken by defendant. The promotional brochure sent to both Northern and Soper represented that "[defendant's] experienced representa-

---

11. In regard to the misrepresentation that local advertising would be supplied at no cost, defendant relies heavily upon the testimony of Soper in which she stated that "[i]n '69 we had no complaints at all about what we received." Defendant contends that this is an admission that Soper was not disenchanted with the type of advertising support provided by defendant. Soper's testimony, however, related to her re-

ceipt of promotional material and advertising mats sent by defendant. She stated that, although she did not use much of the material, she had no complaints concerning the material. That statement does not foreclose her fraud claim which is premised not upon what she actually received but what she failed to receive—cost-free local advertising.

tives are experts in seeking out ideal locations and in analyzing these locations to determine their maximum business potential." While there was a location analysis form used by defendant's distributors, the form had not been developed specifically for the dry cleaning industry. Defendant's forms were of the type used for analyzing locations of gas stations, car washes and supermarkets. There was no evidence to indicate that defendant's distributors possessed any expertise in finding or analyzing the locations of A.P. Centers. We think that there is sufficient evidence in the present record from which the jury could have inferred that Jacobson had misrepresented the source and utility of the location analysis methods implemented by defendant.

Our review of the record discloses that there was sufficient evidence to establish all the requisite elements of fraud. The jury was presented with sufficient, although not substantial, evidence from which it could find that fraudulent representations had been made to plaintiffs. We also conclude that, contrary to defendant's allegations, there was sufficient evidence to support the finding that plaintiffs relied upon the false representations and suffered injury because of them. We therefore will not disturb the jury awards on the fraud counts.

IV. *Damages and Attorneys' Fees.*

Defendant also contends that the amount of actual damages awarded by the jury on the fraud counts finds no evidentiary support in the record. In Missouri the measure of actual damages for fraud "is the difference between the actual value of the property at the time purchased and the value it would have had had the representations been true." *Salmon v. Brookshire,* 301 S.W.2d 48, 54 (Mo.App.1957). Although the amount of damages is not required to be measured with exactness and precision, *Dean Foods Co. v. Albrecht Dairy Co.,* 396 F.2d 652, 661 (8th Cir. 1968), the extent of damage must be proved with reasonable certainty. *Schmidt v. Central Hardware*

*Co.,* 516 S.W.2d 556, 559 (Mo.App.1974). The jury is vested with broad discretion in establishing the amount of damages as a review and weighing of facts are inherent in this process. *Gathright v. Pendegraft,* 433 S.W.2d 299, 317–18 (Mo.1968).

In the present case, the jury was apprised of the actual value of the A.P. Centers purchased by plaintiffs Northern and Soper since the terms of their initial purchases were placed in evidence. The testimony of plaintiffs' expert witness, Thomas Eads, provided a basis for determining the value of the property had the misrepresentations been true. While the proof of actual damage in this case could not be reduced to mathematical exactitude, plaintiffs produced the best evidence available and provided the jury with a reasonable basis for determining the extent of the loss. *Moore v. St. Louis Southwestern Ry.,* 301 S.W.2d 395, 402–03 (Mo.App.1957). We think the awards of $15,000 for Northern and $8,000 for Soper for actual damages are commensurate with the nature and degree of injury incurred by those plaintiffs.

The jury also awarded Northern and Soper each $100,000 in punitive damages. In Missouri punitive damages are awarded for the purpose of punishing the wrongdoer and as an example and deterrent to others engaging in similar conduct in the future. *Chappell v. City of Springfield,* 423 S.W.2d 810, 814 (Mo.1968). Punitive damages are allowed only when there is a finding of legal malice. "Legal malice exists where a wrongful act is intentionally done without just cause or excuse * *." *Schmidt v. Central Hardware Co., supra,* 516 S.W.2d at 560.

We entertain some doubt as to whether the present record provides a sufficient basis for punitive damages. However, we are aware that questions of "intent" and "malice" are more appropriately suitable for jury determination, not appellate review. Under Missouri law, "[t]he question of whether or not punitive damages shall be awarded and, if so, in what amount rests peculiarly in the discretion of the jury."

*Wisner v. S.S. Kresge Co.,* 465 S.W.2d 666, 669 (Mo.App.1971). We shall therefore defer to the jury's implicit finding that there is sufficient legal malice to permit the awarding of a certain amount of punitive damages. However, the amount of damages, which also rests in the discretion of the jury, "must have some reasonable relation to the injury inflicted." *Wisner v. S.S. Kresge Co., supra* at 669; *see Beggs v. Universal C.I.T. Credit Corp.,* 409 S.W.2d 719, 724 (Mo.1966); *Schmidt v. Central Hardware Co., supra* at 560. Our review of the record in this case convinces us that an award of $100,000 to each plaintiff was disproportionate to the injuries suffered and was an abuse of discretion on the part of the jury. We think a punitive damage award of $35,000 each to plaintiffs Northern and Soper is at the outer range for punitive awards under the factual context of this case and accordingly reduce these punitive awards to $35,000 each.

 Defendant also contends that the District Court's approval of an attorneys' fee award amounting to $90,500 for the antitrust counts lacked evidentiary support, did not differentiate between counts on which plaintiffs did and did not prevail, and was exorbitant and unreasonable. The awarding of attorneys' fees rests in the sound discretion of the District Court and a party attacking an award of attorneys' fees in an antitrust case "has the burden of clearly demonstrating error as to the factual basis, or abuse as to the discretional margin, involved in [the] allowance." *Armco Steel Corp. v. North Dakota,* 376 F.2d 206, 212 (8th Cir. 1967). We conclude that the award in this complex case was within the discretion of the District Court and rested on an established factual basis. The District Court was well aware of the counts to which the attorneys' fees related, the time spent, the complexity of the issues and results achieved. We perceive of no legal basis for disturbing these allowances.

We therefore affirm the District Court in all respects except to reduce the punitive damage awards to Northern and Soper to $35,000 each.