**In re Wayne Lee DeLAY, Debtor.**

**Wayne Lee DeLAY, Plaintiff,**

**v.**

**James A. UNDERWOOD, John T. Kay, Zachary T. Cartwright, Robert J. Seek, Respondents.**

**Bankruptcy No. 81–02550–C.**

United States Bankruptcy Court, W.D. Missouri, C.D.

Dec. 17, 1982.

John S. Pletz, Jefferson City, Mo., for debtor.

Robert J. Seek, Sp. Pros. Atty., Eldon, Mo., pro se.

Zachary T. Cartwright, Jr., pro se.

John T. Kay, California, Mo., for Underwood and pro se.

Clarence W. Hawk, California, Mo., for respondent James A. Underwood.

Jack E. Brown, Columbia, Mo., trustee.

## MEMORANDUM OPINION AND ORDER

FRANK P. BARKER, Jr., Chief Judge.

This matter is before the Court pursuant to an Order of this Court to Show Cause why the respondents should not be held in contempt for violations of the automatic stay provided in 11 U.S.C. § 362. The alleged contemptuous acts included, (1) dunning the debtor by means of a "collection letter" after his bankruptcy petition had been filed, (2) oral harassment of and threats to the debtor in the courthouse hallway just prior to the debtor's scheduled § 341 meeting of creditors, (3) instigation of a criminal complaint against the debtor for the purpose of collection of a pre-petition debt, (4) the arrest and subsequent jailing of the debtor shortly after he received his discharge in bankruptcy, and finally, (5) causing the debtor to be bound over for trial in Missouri State Court on the aforementioned criminal charge.

The fact situation can be more easily understood if the interrelationship between the various parties is explained at the outset.

Respondent T.J. Underwood is a distributor of various types of merchandise as the president of T & J Distributors, Inc. His

business is located in California, Missouri, the county seat of Moniteau County.

Respondent John T. Kay is the prosecuting attorney of Moniteau County and also acted as Mr. Underwood's attorney in various civil matters including Mr. Underwood's attempt to collect a $1,076.55 debt from the debtor.

Respondent Zachary T. Cartwright practices law with Mr. Kay and was appointed the assistant prosecuting attorney of Moniteau County by Mr. Kay.

Respondent Robert Seek is an attorney practicing in Miller County, Missouri. He was appointed as a special prosecutor for that county which is adjacent to Moniteau County.

Wayne DeLay, the debtor, who was an independent contractor sold merchandise obtained from Mr. Underwood and other similarly situated distributors to his own customers located throughout central Missouri. DeLay serviced his customers from a van in which he carried merchandise. His practice was to sell items directly from the van or to take orders for specific items which he would obtain and deliver to the customer at a later date.

Debtor's business relationship with Mr. Underwood consisted of, at various times, driving to T & J Distributors and obtaining various items of merchandise which had either already been ordered by customers or to restock the supply in his van. He would sign a receipt for the merchandise, load it into his van and then proceed along his sales route. At the end of each week he would fill out a report listing all the T & J Distributors merchandise he had sold on a T & J invoice and pay them for the merchandise. Debtor testified he deducted "his commission and over-rides" before settling up.

The debtor further testified that it was his practice to record a sale on a T & J Distributors' invoice if the sale was of T & J merchandise. He similarly used the invoices of other distributors if he sold their merchandise. He sometimes used his own invoice if it was his own merchandise that he sold. Debtor also testified that at least some of his customers did not like Mr. Underwood and would not knowingly purchase T & J Distributors' merchandise. In those cases, the debtor testified that in order to complete a sale he would record the transaction on his own invoice rather than use one of T & J's.

This business relationship between DeLay and Underwood existed to the apparent satisfaction of the parties for some time. The evidence presented established that during the entire course of this relationship, Underwood kept a running account with DeLay which showed that DeLay always owed Underwood for at least some unsold merchandise.

In May of 1981 the debtor obtained some merchandise from T & J in the usual manner. That merchandise included several types of welding rods. Debtor later sold those welding rods to the MFA store in Tipton, Missouri. He testified that the store manager was one of his customers who refused to deal with Underwood or T & J, so he billed MFA on his own invoice and received a check for $336.15 payable to himself. He subsequently deposited that check into his own bank account.

Shortly thereafter DeLay and Underwood had a falling out and ended their business relationship. DeLay filled out a final sales report which did not include the money he had been paid by the MFA. DeLay testified at trial that Underwood owed him money for some unpaid prior services. He further testified that he returned all unsold T & J merchandise from his garage and van.

On August 17, 1981 debtor and his wife filed a voluntary joint Chapter 7 bankruptcy petition. T & J Distributors, Inc. was scheduled as a general creditor holding a $1,200.00 disputed claim.

On August 24, 1981 the Clerk of the Bankruptcy Court mailed a notice of the § 341 meeting of creditors to all listed creditors including T & J Distributors, Inc. That notice included notice of the automatic stay. Evidence presented at the trial indicated that Underwood would have received

this notice on August 25, 1981. Underwood testified that he did receive the notice but could not remember the exact day.

▪ Also on August 25, respondent Kay, acting as Mr. Underwood's attorney, caused a demand collection letter to be sent to DeLay. That letter stated: "I have been retained by T & J Distributors for purposes of collecting your account now delinquent in the amount of $1,076.55. It is our understanding that you have not made payment in spite of repeated requests."

Both Underwood and Kay testified that Underwood had retained Kay approximately a month earlier to aid him in collecting the debt. Kay testified that the press of other business had prevented him from sending out the letter to DeLay until August 25, 1981.

This collection letter after the filing of the bankruptcy petition was a violation of the automatic stay. I am, however, willing to accept their testimony on this point and will, therefore find no contempt on the part of either of the respondents involved for this particular action.

The second allegation of contemptuous conduct involves a meeting between Underwood and DeLay in the hallway outside the courtroom in Jefferson City, Missouri just prior to the § 341 meeting of creditors on September 25, 1981.

DeLay testified that he was standing in the hallway with his wife and his attorney, Jack Pletz, when Underwood approached them and:

"asked me very belligerently what I was going to do about his money that I owed him.

Q: What did you say?

A: I informed him at that point, 'Nothing at this time'.

More conversation took place. Mr. Pletz let him know that he was my attorney and Mr. Pletz instructed me not to talk to him, at which time Mr. Underwood said, 'I will get my money one way or another.'

Q: Did he indicate to you at that time that he intended or was thinking of filing criminal charges?

A: That was mentioned, Yes, sir.

Q: Who mentioned it?

A: Mr. Underwood mentioned it.

Q: And was it at the same, in the same context, that he indicated he would get his money in another way?

A: Yes, sir.

Q: And can you tell the Court to the very best of your recollection the exact words that Mr. Underwood used when he told you that?

A: To my best recollection he says, 'I will get paid, and I can and will take criminal charges if I don't get paid.'

· (TR. pps. 23 & 24)

DeLay testified that Underwood also questioned him at the § 341 meeting asking him whether he was going to reaffirm the debt to T & J. DeLay answered that he was not going to do so. DeLay further testified that Underwood then asked the bankruptcy trustee about the possibility of pursuing criminal charges against the debtor. No other evidence was introduced concerning this exchange.

Attorney Pletz also testified concerning the confrontation in the courtroom hallway between Underwood and DeLay. That testimony indicated:

"He (Mr. Underwood) came over to us and addressed himself to Wayne in a hostile manner and asked, 'Where's my money? I want to be paid. When am I going to be paid?'

Q: Who responded to that statement?

A: Initially I think Wayne did and said that we were in the bankruptcy process. And I recall interjecting that this is a debt in bankruptcy and Wayne could not pay it at this time.

Q: What else did Mr. Underwood say to you that you recall?

A: After that he indicated—he threatened to take other action. I believe he mentioned criminal or stealing or something like that. That he would, Wayne wouldn't get away with this, or he'd get even or something to that effect."

(TR. p. 68)

Mr. Underwood also testified concerning the confrontation and, not surprisingly, he presents an entirely different picture of the incident. He denied making any threats to the debtor and stated he had merely asked DeLay whether "he wanted to discuss our problems before we got involved in the Court." (TR. p. 93). He denied ever indicating that he intended to collect his debt in any manner possible.

While Underwood testified that he was not a "vengeful man", his demeanor on the witness stand and the testimony of the other witnesses belies this testimony. The evidence presented at trial paints a clear picture of Underwood as a man determined to collect the money he believed DeLay owed him by any means available. In explanation of his actions Underwood testified:

"Wayne and I've been friends for, gee-whiz, six-seven-eight years; and I had evidence to make me believe that if he insisted on double-crossing me, then I had evidence to prosecute him ... at that moment I did not intend to hurt him ... because Wayne took the way of the (bankruptcy) laws as a protection for himself, in effect spitting on me..." (TR. pps. 93, 94)

Although Mr. Underwood would prefer to be portrayed as an outraged citizen merely doing his duty, testimony such as that cited above and the testimony of DeLay and Mr. Pletz clearly indicates that he (Underwood) was primarily interested in collecting a debt and considered the threat of criminal action to be the best way to accomplish that end.

Unfortunately for all the parties involved in this proceeding it appears that Mr. Underwood did not know that he could file a complaint objecting to the dischargeability of the alleged debt. Apparently Mr. Kay did not advise Mr. Underwood about any of the rights afforded a creditor in a bankruptcy proceeding despite the fact that Underwood talked to Kay about attending the § 341 meeting. Mr. Kay's advice to Mr. Underwood was apparently limited to the observation that it was a no-asset case.

Within a few days after the meeting of creditors Underwood talked to either Mr. Kay or Mr. Cartwright about the possibility of filing a criminal charge against the debtor. He was advised to bring the matter to the sheriff which he did. The sheriff had him write out a statement. That statement accuses the debtor of "conversion" which under the revised Missouri Criminal Code comes within the crime of stealing as set forth in Chapter 570 (RS Mo.1979).

The Sheriff of Moniteau County, David Lamm, was not called to testify at the original hearing in this matter. Because there was a need for his testimony he was ordered to appear for questioning before this Court and he did so appear on August 26, 1982. Basically he testified that he conducted no investigation of Underwood's complaint and merely sent the statement to the prosecuting attorney (Kay). Approximately a month later he received a warrant for Mr. DeLay's arrest.

It is also worth noting that neither Mr. Kay nor Mr. Cartwright made any investigation of Underwood's complaint prior to obtaining the warrant for DeLay's arrest. They did not bother to question DeLay or look at any of his or Underwood's records. Nor did they question anyone else who might have had knowledge of the matter. Apparently all that happened was that Cartwright signed the complaint.

Sometime during this period DeLay moved to the St. Louis area. He was still required to attend the hearing on his discharge in Jefferson City, Missouri on December 11, 1981. Underwood, knowing this, drove to Jefferson City and arranged with the local sheriff to identify DeLay at the courthouse. The sheriff then arrested DeLay in front of the courthouse immediately after the discharge hearing. DeLay was in jail in Jefferson City for some 4 or 5 hours before being released on a $500 bond.

Since that time DeLay has been required to make several appearances in Moniteau County in connection with the pending criminal charges. His attorney, Mr. Pletz, eventually moved for a change of venue to Miller County in light of the obvious conflict of interest involved in a prosecution of

DeLay by either Mr. Kay or Mr. Cartwright. At that point Mr. Seek enters the picture as a special prosecutor appointed by Miller County. DeLay was subsequently bound over for trial on a charge of stealing.

Although Mr. Underwood's testimony is not consistent as to when he became aware of the sale to the Tipton MFA it seems evident that he knew of that sale prior to the § 341 meeting on September 25, 1981.

Based on all the evidence presented at trial it is quite apparent that Mr. Underwood deliberately set out to collect the debt from DeLay before the § 341 meeting by threatening the debtor. When this effort failed he sought revenge by filing a criminal complaint as he had threatened to do. His self-serving testimony stating that he was acting only as a private citizen interested in seeing that the laws of Missouri were enforced is unbelievable if not ludicrous in light of his other testimony and that of Mr. DeLay and Mr. Pletz.

This Court has no trouble finding that Mr. Underwood violated the terms of the automatic stay by threatening the debtor prior to the § 341 meeting and again by filing the criminal complaint with the sheriff. The recent case of *Matter of Ohio Waste Services, Inc.* 9 BCD 85Z, 23 B.R. 59 (Bkrtcy.Ohio 1982) supports the finding that such threats of criminal prosecution and the filing of a criminal complaint with the primary purpose of collecting a debt violates the stay of § 362(a). By acting after the debtor's discharge, Underwood also violated the injunctive provisions of the discharge order.

Despite the fact that a finding of willful, deliberate conduct is not always necessary to support a finding of contempt, see *In re Demp,* 23 B.R. 239, 9 B.C.D. 838 (Bkrtcy.Pa.1982), it is obvious in this case that Mr. Underwood acted with full knowledge of the bankruptcy petition and of the stays. In making the threats and filing the criminal complaint Mr. Underwood clearly acted willfully and deliberately. This Court has no trouble finding that such acts constitute civil contempt.

As to attorneys Kay and Cartwright, the fact that they were acting in their official capacity as prosecuting attorneys works to prevent a finding that their conduct was contemptuous in this matter. Such a finding does not alter the fact that their conduct in this matter was, at best, suspect. To blindly accept a complaint filed by their own client and then act on it in their official capacity without even making the slightest attempt to investigate the basis for that complaint badly abuses the legal system Kay and Cartwright are pledged to serve.

Finally, as to attorney Seek, he more or less "inherited" the case when it was transferred to Miller County. During the trial herein this Court ruled that no finding of civil contempt would be made against Seek. Intent in a stealing charge is a question for the fact-finder. So Mr. Seek may have felt he had grounds to pursue the matter. Attorney Seek's participation in this affair actually involved no more than the making of a decision to proceed with the charges against DeLay. It was Seek's decision whether or not he could make a submissable case of stealing based on DeLay's conduct. There are, however, a few items worth noting about DeLay's conduct as it relates to a charge of stealing under Missouri law.

From the facts presented it is clear that DeLay had a running account with T & J Distributors from the beginning of their relationship. DeLay was not an employee of T & J. He was accountable for T & J merchandise he signed for. He also had the right to return unsold merchandise and receive full credit from T & J.

Describing his business relationship with Underwood and T & J DeLay testified:

> "I was buying commodities from him and selling items for him and selling items for him under T & J Distributors . . . on part of my sales I was a commissioned vendor for him and part of it I bought and resold under my own name." (TR. p. 18)

Underwood would like to, and did so in his complaint to the sheriff, characterize

the relationship between himself and De-Lay as one of consignor-consignee. The facts indicate that their relationship was in fact one of "sale or return" under Missouri law. In such a relationship title to the merchandise would pass to DeLay upon delivery. See, § 400.2–326; 2–401 (R.S.Mo.)

On May 29, 1981, according to evidence presented by T & J, DeLay owed that company $1,613.44 for merchandise he had received (Def.Ex. 6). On May 29 he purchased on invoice No. 27705 merchandise for $137.38 and on invoice No. 27706 merchandise for $258.48. This left a total debt of $2,009.30 when DeLay left T & J's that morning to start his sales route. According to Kay's letter to DeLay, T & J claimed he (DeLay) still owed them $1,076.55 after the business relationship was ended and DeLay had returned the unsold merchandise. Since the return of merchandise occurred less than ninety days prior to the filing of the bankruptcy petition by DeLay and under Missouri law, DeLay had title to the merchandise it would seem that the return of some $922.75 in merchandise would be a voidable preference as T & J was a general creditor in the bankruptcy proceeding. The Trustee is directed to investigate the facts of this case to determine whether or not a complaint should be filed against T & J Distributors, Inc. and T.J. Underwood to recover the merchandise returned by the debtor or its value in the sum of $922.75.

The evidence of stealing against DeLay appears circumstantial and speculative at best. Without establishing intent no crime was committed merely by placing the funds in his own bank account. DeLay testified that he had paid certain of his creditors including T & J from this account in the past. He also testified that T & J owed him money for some past services. The evidence also established that DeLay made some sales subsequent to the sale to the Tipton MFA and that he recorded these sales on T & J invoices. Such sales continued through June 18, 1981.

One final point should be discussed in light of attorney Cartwright's misguided and somewhat vocal objection to the juris-diction of this Court to enjoin a state criminal proceeding. He also filed a trial brief on this point. Mr. Cartwright's research is, at best, incomplete. His brief stresses three points "not in his capacity as assistant prosecuting attorney of Moniteau County, and not on behalf of his partnership with John T. Kay, but rather as an individual member of the Missouri Bar who has been accused of callously disregarding the rights of a debtor under the bankruptcy law..." Those three points were:

(1) This Court does not have the power to enjoin a criminal prosecution, and

(2) The evidence in this case does not support the issuance of an injunction, and

(3) There has been no violation of any Order of this Court by defendants (presumably he means respondents).

This Court does not wholly disagree with Mr. Cartwright's first contention. There is, to say the least, considerable controversy regarding the power of a bankruptcy court acting under 11 U.S.C. § 105 to enjoin a state criminal prosecution. *In re Demp, supra* and *In re Taylor,* 16 B.R. 323 (Bkrtcy.Md.1981) (and the cases cited therein) establish that at least some bankruptcy courts feel they have the power to enjoin such proceedings in the proper circumstances. The factor that exists in this case which makes this Court's power to act as it has quite valid is the fact that only an Order to Show Cause was issued. This is a factor Mr. Cartwright ignored, misunderstood or did not investigate (a likely possibility considering his participation in De-Lay's criminal prosecution). This Court has not enjoined the prosecution of a criminal case. What was done was to issue an Order to Show Cause why such an injunction should not be issued. The effect of this Order was to retain the *status quo* until an evidentiary hearing could be held. This Court can only suggest that Mr. Cartwright read 11 U.S.C. § 105(a) at some time in the future.

Mr. Cartwright's points (2) and (3) are argumentative and merely an attempt to excuse himself and his fellow attorney for

their total failure to conduct any investigation prior to causing a criminal complaint to be issued against the debtor. Had any effort been made to conduct such an investigation, this entire matter might have been viewed in a different light. Reasonable minds can differ as to what does or does not constitute grounds for the prosecution of a criminal charge; but for Kay, Cartwright and even Seek to blindly accept Underwood's statement of the facts and pursue a criminal charge based thereon under the facts of this case, smacks of abuse of the judicial process.

Any injunction prohibiting prosecutors Kay, Cartwright and Seek from proceeding with the prosecution of *State v. DeLay* is hereby dissolved and the Order to Show Cause vacated.

This Court anticipates that counsel for DeLay will again petition for a change of venue and then obtain a fair and unbiased review of the charges filed. Competent counsel should have little difficulty in obtaining a dismissal or acquittal upon proper presentation of the facts.

Respondent Underwood is permanently restrained and enjoined from trying to enforce DeLay's personal liability on the disputed debt.

The facts of this case quite clearly demonstrate respondent Underwood's utter disregard of the automatic stay after having been put on notice; such was wrongful and should not be countenanced by this Court. The effect of his conduct was to cause the debtor undue suffering and hardship. The Court concludes that compensatory damages should be assessed in favor of the debtor.

This Court also has jurisdiction to impose a punative fine up to $250 for contemptuous conduct. In this case there were three (3) separate incidents. *Northern v. McGraw-Edison Co.,* 542 F.2d 1336, (8th Cir. 1976), *cert. denied* 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1976). Punative damages does not require malice or ill will; it does require that the conduct be intentional and without just cause.

I find that Underwood's conduct was intentional and without just cause.

The facts of this case also merit an award of attorney fees for the debtor in sum of $1,000.00. See *Matter of Preferred Surfacing, Inc.,* 3 B.C.D. 94 (N.D.Ga.1976).

Judgment will be entered in favor of Wayne Lee DeLay and against respondent T.J. Underwood and T & J Distributors, Inc. as compensatory damages of $1,000 for personal expenses and loss of work and $1,000.00 for attorney fees.

Punitive fines of $250.00 for violation of the automatic stay on September 25, 1981, $250.00 for violation of the automatic stay on September 30, 1981 and $250.00 for violation of the permanent injunction on December 11, 1981 are assessed against respondents T.J. Underwood and T & J Distributors, Inc. as are costs in sum of $306.00.

Counsel for the debtor is directed to prepare, serve and file a proposed judgment within seven (7) days.

So ORDERED this 17th day of December, 1982.