**ARMCO STEEL CORPORATION,**
Appellant,

v.

**STATE OF NORTH DAKOTA,** for the Use and Benefit of the **STATE HIGHWAY FUND** ex rel. Walter **HJELLE,** State Highway Commissioner, Appellee.

No. 18130.

United States Court of Appeals
Eighth Circuit.

April 11, 1967.

William R. Pearce, of Pearce, Engebretson, Anderson & Schmidt, Bismarck, N. D., for appellant and filed printed brief.

David L. Milhollan, Bismarck, N. D., and Albert A. Wolf, Bismarck, N. D., for appellee State of North Dakota, etc. and filed brief.

Before JOHNSEN, Senior Circuit Judge, BLACKMUN, Circuit Judge, and YOUNG, District Judge.

JOHNSEN, Senior Circuit Judge.

Armco Steel Corporation has appealed from a judgment of $775,065 in treble damages and an attorney's fee allowance of $72,500 in a suit brought by the State of North Dakota under 15 U.S.C.A. § 15, for injury from violation of Section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1.[1]

1. In form the suit was one on the relation of the State Highway Commissioner for the use and benefit of the State Highway Fund, under North Dakota law and practice. It originally ran against Armco Drainage & Metal Products, Inc. as defendant—a wholly-owned subsidiary of Armco Steel Corporation which has been merged into the parent corporation. The latter has accordingly assumed the position of defendant, both as to designation and as to liability. Further distinction in respect to this aspect is unnecessary here, and the opinion will simply make reference to them generally as Armco.

The amount of actual damages which the jury found that the State had sustained was $258,355.00. The period of injury involved was from 1957 to June 17, 1960, the date of an indictment against Armco for antitrust offense. Armco had pleaded guilty to the charge, which was one of conspiracy to fix prices upon corrugated culverts. The complaint alleged that the conspiracy had included structural plate pipes and metal end sections as well as corrugated culverts, and sought damages as to all three products in the use made of them for state highway purposes.[2] The major part of the State's claim, however, had relation to corrugated culverts.

As part of its proof that a conspiracy had existed, the State was permitted to introduce in evidence the judgment of conviction against Armco based on its plea of guilty to the indictment charge. The State further produced testimony by the other conspirators, and by some contractors, from which the jury could properly find that all three of the products had been the subject of list prices made up by Armco, of whose amounts the three North Dakota suppliers were kept advised and to which they conformed; that representatives of Armco had made it clear to the three suppliers, through meetings and in conversations, that they were expected to conform to these list prices in the bids submitted by them to the State for any direct purchases by it of such products, and also in the price quotations made by them to contractors on such products for use by the latter as an element in the bids submitted on state highway-construction projects; and that the suppliers with understanding and acceptance among them had gone along together on this basis, realizing

that Armco was in a position to undercut them and to disrupt the general price levels, as it had specifically told one of the suppliers it would do, if any of them engaged in a list-price departure.

■ On what has been set out, there is no merit in Armco's first contention for reversal that, even if the evidence was sufficient to establish a conspiracy as to corrugated culverts, which the indictment had charged and to which Armco had pleaded guilty, it was not sufficient to establish that the conspiracy also extended to structural plate pipes and metal end sections. As stated, however, these two products had been made the subject of list-price specification by Armco, similarly as corrugated culverts. And on the probative indications in the testimony of the State's witnesses, use was similarly made of the list prices as to all three products in the bids of the conspirators on direct purchases by the State, and in their price quotations to contractors for utilization as a cost basis in bidding on highway construction projects. Thus we can see no question as to the jury's right to find that all three products were within the intendment and execution of the conspiracy.

■ Armco's second contention here is that it was error to permit introduction of the judgment of conviction against it as prima facie evidence that the price-fixing conspiracy had existed. The argument is that a judgment of conviction based on a plea of guilty is subject to the exclusionary proviso of Section 5(a) of the Clayton Act, 15 U.S.C.A. § 16(a), relating to "consent judgments".

That section in its pertinent part provides:

"A final judgment or decree heretofore or hereafter rendered in any civil

2. The other conspirators were three North Dakota fabricators of corrugated culverts made from metal sheets purchased primarily from Armco. They further were suppliers of structural plate pipes and end sections purchased primarily from Armco. Armco was, however, also in the business of selling corrugated culverts, structural plate pipes and end sections for highway purposes in North Dakota, but all of its

plants were located outside the State. The local conspirators were named in the complaint, as they also had been in the indictment, but they were not made defendants. This was perhaps because they constituted the State's primary witnesses, and perhaps also because the evidence showed that Armco had been the dominating figure in what had been done.

or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws * * as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: *Provided,* That this section shall not apply to consent judgments or decrees entered before any testimony has been taken * * * ".

The question whether § 5(a) must be regarded as having made a judgment of conviction for antitrust violation, based on a plea of guilty, inadmissible in a suit by a private party for injury from the violation is one which has never been conclusively settled. The Supreme Court has made no expression upon it, and oddly enough, it is only within the last four years that any decisions have occurred thereon in the Courts of Appeals. Before these recent appellate decisions, a number of the District Courts had expressed the view that such a judgment of conviction was rendered inadmissible by the proviso of § 5(a). The earliest reported and most cited of these expressions appears to be that of Judge Nordbye in *Twin Ports Oil Co. v. Pure Oil Co.,* 26 F.Supp. 366 (D.C.Minn.1939). That case, however, involved a nolo contendere plea, so that the expression made as to a plea of guilty was of course dictum. Nevertheless, it was viewed as of such demonstrativeness that it was accepted for some time by the District Courts generally, and it has perhaps been largely responsible for the question not earlier having been carried to the Courts of Appeals.

But a lurking dissatisfaction with the construction as not being necessary and not being facilitative of the remedial purpose of the antitrust statutes finally brought the question to the Courts of Appeals, in three different circuits, within relatively rapid sequence; and the three courts all held that § 5(a)

was not required to be interpreted as precluding the admission of such a criminal judgment, but only those based on pleas of nolo contendere had to be compellingly regarded as coming within the exclusion of the proviso. Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., 323 F.2d 412, 415–417 (7 Cir. 1963), cert. den. 376 U.S. 939, 84 S.Ct. 794, 11 L.Ed.2d 659; City of Burbank v. General Electric Co., 329 F.2d 825, 834–835 (9 Cir. 1964); General Electric Co. v. City of San Antonio, 334 F.2d 480, 484–487 (5 Cir. 1964).

There has been no decision by a Court of Appeals to the contrary. We find the reasoning of the three cases of sufficient legal appeal and constructional acceptability so that we are content to follow their holding and to continue the uniformity of the appellate decisions.

Basically what the question gets down to, when consideration is related to the broad remedial purpose of the antitrust statutes, is whether, on the language of the proviso of § 5(a) or on the available legislative history thereof, it is so clear as to be compelling that Congress was intending to abolish as to antitrust violations the probative status which has traditionally been accorded to pleas of guilty in criminal cases as judicial admissions. See generally 31A C.J.S. Evidence § 300(b), p. 769; 31 A.L.R. Annotation, 261, 278; 18 A.L.R.2d, Annotation, 1287, 1307.

On this approach, the argument that the language "consent judgments or decrees" in the proviso is without room for interpretative distinction between convictions based on pleas of nolo contendere and those based on pleas of guilty is not nakedly persuasive. Also, it would seem that there could properly be rational judicial doubt whether the expressions made on the Senate floor, which have been set out in Judge Nordbye's *Twin Ports* opinion, 26 F.Supp. at pp. 374–376, had so permeated the entire legislative course, and been of such manifest constructional acceptance, that they must be held to be derogationally conclusive against the primary object of § 5 to

make easier the remedial path for those who are victims of antitrust injury.

In another context but not without general relevance here, the Supreme Court has said that the purpose reflected by the history of § 5 was "to minimize the burdens of litigation for injured private suitors by making available to them all matters previously established by the Government in antitrust actions", and that "We think that Congress intended to confer, subject only to a defendant's enjoyment of its day in court against a new party, as large an advantage as the estoppel doctrine would afford had the Government brought suit". Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 568, 71 S.Ct. 408, 413–414, 95 L.Ed. 534 (1951).

Relegating further exposition of the rationale underlying the three Courts of Appeals' decisions to a reading of those opinions, we merely quote—in collateral lighting up of the constructional position of the antitrust bar itself—Judge Barnes' concluding observations in the *City of Burbank* case, supra, 329 F.2d at 835–836:

"Without reference to counsel here involved, we think it curious that antitrust lawyers who will and have spent hours in urging district court judges that their clients should be permitted to plead *nolo contendere* rather than guilty to antitrust government charges, because of the differing effect of the two pleas, should now urge there really is not and should not be any different consequences of the two pleas. * * * We think it fair to state the general understanding among the antitrust bar has long been that a difference existed between the effect of the two pleas. We think it better law that there should be, and we hold there is".

■ Armco's next contentions relate to the damages recovered.[3] It is argued that the use of the conspiratorial list prices in quotation to contractors for use as an element in bidding on highway construction projects could not occasion any injury to the State, but only to the contractors. This argument, however, ignores the realities, which the evidence entitled the jury to find existed, that the price quotations made by a supplier to a contractor as to a particular project constituted in the trade a commitment to the contractor to supply him with such quantity of the products as was required by the plans and specifications, upon the quoted basis, should he get the job; that while the supplier might, if the contractor got the job, grant him some discount from the quoted price, this was never done until after he had been awarded the job, nor was there any agreement or obligation in this regard at the time the price quotations were made, and the amount of any such discounts could vary as between projects; and that it accordingly was the uniform practice of the contractors to use the list-price quotations as their cost basis for the products in making up their bids on a project.[4]

With the same price quotation for the product being made to all contractors bidding on a highway project; with this quotation being used by the contractors as their cost basis for the product in computing their project bid; and with the conspirators having knowledge of this bidding reality and making quotation of their unlawfully-fixed prices on that basis—there could hardly be much question that such prices, in their margin of artificiality from lack of competitive play, operated directly to injure the State in increased cost of its highway projects. Indeed, it would be difficult, if not im-

3. Only a small amount of direct purchases by the State was involved (approximately $2,000) so that most of the damages recovered were for the increased cost to which the State was subjected because of the list prices in project bids by contractors.

4. The following testimony by one of the contractors is typical: "Before a bid let-ting I get prices from suppliers of materials, including metal culverts. I use the quote I get from the supplier; it is the only thing I can use. To that I add my profit and the installation costs. The quotations given me are based on what has been called the 'list price' ".

possible, for the jury to escape the conclusion that the use which was made of the products in the State's highway projects constituted a specific target of the conspiracy—which fact, though not necessary to a recovery right by the State, at least added clarity on the proximateness of the injury.

■ As an incident of the contention just discussed, Armco has also argued that it was error for the court not to allow it to cross-examine the contractors testifying for the State or to make independent proof as to the discounts which they had received from the conspirators on the jobs which the State had awarded them, and thus to bring out what their actual purchase price of the products had been. But as has been indicated, it was the list-price quotation which constituted the commitment figure to a contractor as to the products for the particular project involved and which was used by him as his cost basis in computing his project bid, so that its unlawful margin as a fixed price was passed on to and made to operate against the State. Thus whatever one of the conspirators might see fit to allow a contractor in discount after he was awarded a project, without any obligation to do so and purely in personal benefit to him, would be without any relevancy on the conspiracy's impact upon the State in its being subjected to the list price in the contractor's bid and thus having the conspirators' use of the unlawful prices operate to increase its project costs and so causing it to "be injured in (its) business or property" under 15 U.S.C.A. § 15.

It may be added that there is indication in some of the testimony that the question of which conspirator was to supply the products for a particular project was a matter of allocation among them,[5] with an attending implication that the subsequent allowing of a discount was a supplier's way of getting his allocation channeled from the contractor to him.

But however that might be, the allowance of a subsequent discount to the contractor to whom a project had been awarded would certainly not mitigate the injury to the State from its having to pay the unlawful list price as part of the cost of the project.

■ Armco makes the further contention as to damages that the State failed to establish that the list prices of the conspiracy were in fact higher than those to which the State otherwise would have been subjected in its project bids. This is conventional general argument in antitrust price-fixing cases. In the situation here, it ignores or overlooks the testimony on the part of an expert witness that the list prices fixed on the products were 17.7 percent higher through the period of the conspiracy than the general market prices which obtained on the products during the three years preceding and the three years following the conspiracy, with there being no play of cost factors or market conditions capable of accounting for the difference. The argument also closes its eyes to the price drop which was shown to have occurred after the conspiracy was exposed, to which fact and the extent thereof, in the absence of other causative factors, the jury further could properly give consideration.

We have no difficulty whatever in holding that there was adequate basis, within the principles of Eastman Kodak Co. of New York v. Southern Photo Materials Co., 278 U.S. 359, 377–379, 47 S.Ct. 400, 71 L.Ed. 684 (1927), and Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562–566, 51 S. Ct. 248, 75 L.Ed. 544 (1931), for the jury to determine and find that the State had sustained proximate injury in the amount of $258,355, on the extent of the artificiality involved in the fixed prices and its ingrediency in the $1,396,500 list-price aggregate of corrugated culverts, structural plate pipes and metal end sections

5. One of the conspirator suppliers testified that "the contractor business" was supposed to be allocated; that initially "Armco wanted 75% of the business, and then it was reduced to 65%".

which had entered into the construction projects let during the conspiracy period, and in the $2,000 quantity of direct purchases made by the State.

Armco's final contention is that the attorney's fee allowance of $72,500 made by the trial court is unreasonable and excessive. Its brief here devotes less than a page to the question. It indicates that a hearing was held and asserts that "we believe in view of the showing made that the amount was beyond a reasonable amount" and that it "is far and beyond local standards of the bar". But Armco has not seen fit to include in the printed record which it has filed as a basis for having us engage in review any part of the hearing involved, and so we have no ready means of knowing on what considerations the court acted in its evaluation.

██ We are thus in effect asked to declare that, regardless of what showing or elements of consideration the court may have had before it, the allowance is unreasonable as a matter of law or on absoluteness as to judicial discretion from the face of the litigation and its result. We have no right to hold that a $72,500 attorney's fee allowance in an antitrust suit, involving preparation, trial, and recovery of a $258,000 injury is legally incapable of being reasonable. Thus, while we do not and can not on the printed record pass on the reasonableness of the allowance as a question of fact, no more is the situation one in which the question of reasonableness is able to be dealt with on its face as a matter of law or discretional limitation. One who seeks review of the amount of an attorney's fee in an antitrust case has the burden of clearly demonstrating error as to the factual basis, or abuse as to the discretional margin, involved in its allowance. Connecticut Importing Co. v. Frankfort Distilleries, 101 F.2d 79, 81 (2 Cir. 1939); Twentieth Century Fox Film Corp. v. Goldwyn, 328 F.2d 190, 221 (9 Cir. 1964).

██ The cost of printing the supplemental record filed by appellee will be taxed to appellant. Five thousand dollars will be allowed appellee as an attorney's fee here. Cf. Twentieth Century Fox Film Corporation v. Goldwyn, supra, 328 F.2d at 222; North Texas Producers Ass'n v. Young, 308 F.2d 235, 246 (5 Cir. 1962); American Can Co. v. Bruce's Juices, Inc., 190 F.2d 73, 74 (5 Cir. 1951).

Affirmed.